**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| MANSOOR LAGHARI,<br>        *Plaintiff*,<br><br>        v.<br><br>STATE OF CONNECTICUIT<br>DEPARTMENT OF CORRECTION<br>        *Defendant*. | No. 3:25-cv-1373-(VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Mansoor Laghari ("Plaintiff" or "Mr. Laghari") filed this action against the State of Connecticut Department of Correction ("Defendant" or "DOC"), asserting employment discrimination, hostile work environment, retaliation, and discharge-related claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA"). Compl., ECF No. 1-1 ("Compl.").

The DOC removed the action to this Court and moved to dismiss the Complaint. Notice of Removal, ECF No. 1; Mot. to Dismiss, ECF No. 19; Mem. in Supp., ECF No. 19-1 ("Def.'s Mem.").

For the following reasons, the DOC's motion to dismiss, ECF No. 19, is **GRANTED** in part and **DENIED** in part.

The DOC's motion is **GRANTED** to the extent Mr. Laghari asserts disparate treatment claims based on sex, race/color, religion, or national origin; hostile work environment claims based on sex or religion; retaliation claims based on his internal complaints or any other alleged retaliatory conduct; and any wrongful termination or constructive discharge claim, as well as to the extent Mr. Laghari seeks a jury trial on his CFEPA claims.

1

To the extent that any of these deficiencies can be remedied, leave to file an Amended Complaint must be filed by **July 2, 2026**. If a motion for leave to file an Amended Complaint is not filed by **July 2, 2026**, the case will proceed only as to the claims referenced below.

The DOC's motion is **DENIED** to the extent Mr. Laghari asserts hostile work environment claims based on race, color, or national origin, and retaliation claims under Title VII and CFEPA based on the alleged denial of his application for promotion to lieutenant following the resolution of his CHRO complaint.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

Mansoor Laghari is a Pakistani male and practicing Muslim who began working for the DOC as a correction officer at Corrigan-Radgowski Correctional Center ("Corrigan") in or around October 2015. Compl. ¶¶ 2-4. Mr. Laghari alleges that he performed his job satisfactorily, but experienced significant discrimination at Corrigan, leading him to file a Connecticut Commission on Human Rights and Opportunities ("CHRO") complaint in 2020 based on race, color, national origin, and religion. *Id*. ¶¶ 5-6. That matter allegedly resolved by agreement around March 2024, and, as part of that agreement, Mr. Laghari transferred to York Correctional Institution ("York") in or around April 2024. *Id*. ¶¶ 7-8.

Shortly after that transfer, Mr. Laghari alleges that the DOC denied his application for promotion to lieutenant in retaliation for his prior discrimination complaint and based on his race, religion, and national origin. *Id*. ¶ 9. Mr. Laghari also alleges that, after arriving at York, he was subjected to harassment and discrimination, including repeated radio calls requiring him to state "22," which he alleges is code for "repeat" and was intended to demean him because of his

accent; radio broadcasts calling him "ridiculous"; and frequent phone calls during which the caller would hang up after he answered. *Id.* ¶¶ 10-13.

Mr. Laghari further alleges that, in May 2024, he filed an internal complaint with Captain Paselio regarding the radio and telephone incidents, but was told that the complaint had been lost and that he needed to rewrite it. *Id.* ¶ 14. Around the same time, Mr. Laghari alleges that Lieutenant Winslow[1] screamed at him over the radio, falsely accused him of improper conduct concerning an inmate's medical care, and later hung up on him after directing him to call her. *Id.* ¶¶ 15-16. Mr. Laghari also alleges that he was repeatedly assigned to undesirable posts, including posts with "lifers" or unstable inmates, and that he received a write-up for being three minutes late even though Caucasian employees allegedly reported to roll call a few minutes late without repercussions. *Id.* ¶¶ 17-19.

Mr. Laghari alleges that on or about June 30, 2024, while assigned to third shift, he saw graffiti in an officers' restroom reading "Go back to Corrigan. Corrigan does not want him," "POS list," and "SMOL," which he interprets as "suck me off Laghari"; he also alleges that he found a note reading "chicken balls" in his desk drawer. *Id.* ¶ 20. Mr. Laghari alleges that Lieutenant Osorio[2] tried to persuade him not to file an incident report, that Warden Sexton[3] said she would call a meeting about the issue but never did, and that DOC Commissioner Angel Quiros did not provide a meaningful response to Mr. Laghari's later letter about alleged systemic racism at YCI. *Id.* ¶¶ 21-23. Mr. Laghari also alleges that, in July 2024, his disciplinary report regarding an inmate was dismissed by his supervisors, and that Lieutenant Marzena Tasarz

---

[1] The Complaint does not provide a full name for this person.
[2] The Complaint does not provide a full name for this person.
[3] The Complaint does not provide a full name for this person.

questioned his judgment and attempted to undermine him by speaking to his partner about an unruly inmate. *Id*. ¶¶ 24-25.

Based on these allegations, Mr. Laghari asserts claims for sex discrimination, race/color discrimination, religious discrimination, and national origin discrimination under the Connecticut Fair Employment Practices Act ("CFEPA") and Title VII as well as a CFEPA retaliation claim. *Id*. Counts One-Nine. He seeks money damages, attorney's fees and costs, equitable relief, and a jury trial. *Id*. Prayer for Relief.

### B.  Procedural History

On July 23, 2025, Mr. Laghari filed the Complaint in Connecticut Superior Court for the Judicial District of New London. Compl., ECF No. 1-1.

On August 27, 2025, the DOC removed the action to this Court. Notice of Removal, ECF No. 1.

On October 3, 2025, the DOC filed a motion to dismiss the Complaint and a memorandum in support. Mot. to Dismiss, ECF No. 19; Mem. in Supp., ECF No. 19-1.

On November 20, 2025, Mr. Laghari filed an objection to the motion to dismiss and a memorandum of law in opposition. Pl.'s Mem. in Opp'n, ECF No. 29.

On January 5, 2026, the DOC filed a reply in support of the motion to dismiss. Def.'s Reply, ECF No. 32.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed.

R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *See also York v. Ass'n of the Bar of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters

of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

## III.   DISCUSSION

Mr. Laghari asserts claims for discrimination, hostile work environment, constructive discharge or wrongful termination, and retaliation under Title VII and CFEPA.

The DOC has moved to dismiss the Complaint in its entirety.

The Court will address each issue in turn.

### A. The Disparate Treatment Claims

#### i. The Disparate Treatment Claims Under Title VII

Mr. Laghari's disparate-treatment claims appear to rest primarily on the allegation that the DOC denied his application for promotion to lieutenant. To the extent the Complaint also relies on the other alleged workplace incidents as discrete disparate-treatment claims, those allegations do not independently plead materially different treatment or discriminatory motive. The Court therefore analyzes the promotion denial as the principal disparate-treatment theory, while also addressing whether the remaining incidents plausibly support any separate disparate-treatment claim.

To state a claim for discriminatory failure to promote under Title VII, a plaintiff must plausibly allege that "(1) [they are] a member of a protected class; (2) [they] applied and [were] qualified for a job for which the employer was seeking applicants; (3) [they were] rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Keaton v. Conn. Dep't of Rehab. Servs.*, No. 3:16-cv-01810 (MPS), 2018 WL 1245728, at *5 (D. Conn. Mar. 9, 2018) (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004)). "In all cases," however, "there must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009)). At the pleading stage, "the facts pled need only give 'plausible support to a minimal inference of discriminatory motivation.'" *Id.* (quoting *Sellers v. First Student, Inc.*, No. 16-cv-236 (JCH), 2016 WL 6440111, at *4 (D. Conn. Oct. 28, 2016), and *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

Mr. Laghari argues that the Complaint satisfies this standard because it alleges that he is "a Pakistani male and a practicing Muslim," that he previously filed a CHRO complaint, and that

7

after the CHRO matter resolved, he was transferred to York Correctional Institution and denied a promotion shortly thereafter. Compl. ¶¶ 3, 6–9 ("The plaintiff is a Pakistani male and a practicing Muslim."); Compl. ¶ 6 (the plaintiff "filed a complaint of discrimination based on race, color, national origin, and religion with the Commission on Human Rights and Opportunities ('CHRO') in 2020."); Compl. ¶ 7 ("That case was eventually resolved by agreement in and around March 2024."); Compl. ¶ 9 ("Just a few days after his transfer to YCI, the plaintiff received a letter from the defendant denying his application for promotion to lieutenant.").

The DOC argues that these allegations are insufficient to state a Title VII disparate treatment claim because Mr. Laghari does not adequately plead protected categories, adverse employment actions, qualifications for the lieutenant position, or causation. Def.'s Mem. at 1 ("Counts One Through Eight Asserting Claims of Disparate Treatment Based on Sex, Race and Color, Religion, and National Origin Under Conn. Gen. Stat. §46a-60(b)(1) and Title VII Are Legally Insufficient as the Plaintiff does not allege his protected categories, adverse employment actions and causation."). The DOC further argues that the failure-to-promote theory fails because Mr. Laghari does not allege that he applied for a specific lieutenant position, that he was qualified for that position, or facts supporting discriminatory motive. Def.'s Mem. at 7 ("He utterly fails to allege the position for which he applied, when he applied for it, what qualifications that position required, what were its duties and responsibilities, and how he qualified for that position.").

The Court agrees.

Mr. Laghari has alleged that he belongs to certain protected categories, and he has alleged that he was denied a promotion to lieutenant. Compl. ¶¶ 3, 9 ("The plaintiff is a Pakistani male

8

and a practicing Muslim."; "the plaintiff received a letter from the defendant denying his application for promotion to lieutenant.").

The issue, however, is not whether the promotion denial occurred, but whether the Complaint alleges enough facts to make it plausible that the denial was discriminatory. Under *Iqbal* and *Twombly*, those allegations must contain enough factual content to make discrimination plausible, not merely possible. *Iqbal*, 556 U.S. at 678 ("the reasonable inference that the defendant is liable"); *Twombly*, 550 U.S. at 555 ("more than labels and conclusions"). The Complaint does not contain sufficient factual allegations connecting the denial of promotion, or the other alleged workplace incidents, to Mr. Laghari's sex, religion, race/color, or national origin in a way that plausibly supports a Title VII disparate treatment claim.

To plead a discriminatory failure-to-promote claim, Mr. Laghari must also allege facts supporting the specific elements of that theory and a plausible inference that the denial was motivated by unlawful discrimination. *See Keaton*, 2018 WL 1245728, at *5 ("[T]here must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination.") (quoting *Aulicino*, 580 F.3d at 80). But the Complaint does not do so.

Specifically, the Complaint does not allege that Mr. Laghari applied for a particular lieutenant position, identify the qualifications required for that position, allege facts showing that he met those qualifications, or identify facts giving rise to a minimal inference that the denial was motivated by his sex, religion, race/color, or national origin. *Cf. Keaton*, 2018 WL 1245728, at *5 (In addition to alleging being "an African-American woman," the plaintiff "also alleges that the position was posted and that . . . a white woman, was promoted to the position on the same day [Plaintiff] received the letter . . . notifying her that she did not receive the position.")(citation and internal quotation marks omitted).

As to discriminatory motive, Mr. Laghari alleges that the denial occurred "just a few days" after his transfer to YCI and that, "[u]pon information and belief," the denial was retaliatory and discriminatory. Compl. ¶ 9 ("Upon information and belief, this promotion denial was retaliatory due to previously filing a claim for discrimination, and it was discriminatory based on his race, religion and national origin."). Those allegations may support the retaliation theory addressed below, but they do not, without more, plausibly allege that the promotion denial was motivated by Mr. Laghari's sex, religion, race/color, or national origin.

Indeed, the Complaint does not allege who made the promotion decision, what qualifications were required, whether Mr. Laghari met those qualifications, who received the position, or any facts suggesting that the decisionmaker acted with discriminatory intent. *See* Def.'s Mem. at 14 ("Plaintiff does not allege who denied him the promotion and if he or she was even aware of Plaintiff's race, religion and national origin.").

The remaining alleged incidents likewise do not plausibly support Mr. Laghari's federal disparate treatment claims. Mr. Laghari alleges radio requests to repeat himself, hang-up phone calls, undesirable posts, a lost internal complaint, a tardiness write-up, graffiti, and inadequate responses to his complaints. Compl. ¶¶ 11–25 ("the other side would frequently state, '22,' which is code for repeat"; "the plaintiff has also been called 'ridiculous' on these radio transmissions"; "the plaintiff has also experienced frequent harassing phone calls wherein the other party hangs up as soon as he answers"; "the plaintiff has continuously been assigned undesirable posts dealing with 'lifers'"; "the plaintiff was written up for an alleged incident of tardiness"; "Go back to Corrigan. Corrigan does not want him."). These allegations may be relevant to Mr. Laghari's hostile work environment theory, addressed below, but they do not independently plead materially different treatment with enough factual detail to satisfy *Twombly* and *Iqbal* or to

provide "plausible support to a minimal inference of discriminatory motivation." *Keaton*, 2018 WL 1245728, at *5.

This is especially true as to sex and religion. The Complaint identifies Mr. Laghari as male and Muslim, but it does not allege facts connecting the denial of promotion or the alleged workplace incidents to either sex or religion. Compl. ¶ 3 ("The plaintiff is a Pakistani male and a practicing Muslim."). Nor does the Complaint allege sex-based or religion-based comments, comparators, or other factual circumstances supporting a plausible inference of discriminatory intent based on those categories. Without those supporting facts, the Complaint does not cross the line from possible to plausible. *Twombly*, 550 U.S. at 570 ("plausible on its face"); *Arista Records*, 604 F.3d at 120 ("factual amplification . . . to render a claim plausible"). Defendant correctly notes that "¶¶ 12 – 25 are entirely devoid of any allegations suggesting a discriminatory animus on the part of anyone involved[.]"). Def.'s Mem. at 15.

Accordingly, the DOC's motion to dismiss will be granted as to Mr. Laghari's federal disparate treatment claims under Title VII, including his discriminatory failure-to-promote theory, and this claim will be dismissed without prejudice.

### ii. The Disparate Treatment Claims Under CFEPA

Mr. Laghari also brings disparate treatment claims under CFEPA. Because the Court will dismiss Mr. Laghari's federal disparate treatment and failure-to-promote claims under Title VII, the Court will not separately adjudicate Mr. Laghari's state-law disparate treatment claims under CFEPA.

Accordingly, the Court does not reach Mr. Laghari's CFEPA disparate treatment claims.

### B. The Hostile Work Environment Claims

### i. The Hostile Work Environment Claim under Title VII

11

To state a hostile work environment claim under Title VII, Mr. Laghari must plausibly allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015). *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated."). This standard has "both objective and subjective components": "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 ("This standard has both objective and subjective components."). And "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* ("The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").

In determining whether a workplace is hostile or abusive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*; *Harris*, 510 U.S. at 23 ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances"). But Title VII does not require psychological injury. *Harris*, 510 U.S. at 22 ("Title VII comes into play before the harassing conduct leads to a nervous breakdown."); *id.* ("there is no need for it also to be psychologically injurious.").

12

At the pleading stage, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the nonmoving party's] favor." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015) ("accept[ing] all factual allegations in the [C]omplaint as true and draw[ing] all reasonable inferences in [the nonmoving party's] favor"). "On a motion to dismiss, the question is not whether a plaintiff is likely to prevail, but whether the well-pleaded factual allegations plausibly give rise to an inference of unlawful discrimination." *Id.* at 87.

Mr. Laghari responds that the Complaint alleges more than isolated or ordinary workplace conflict. Pl.'s Mem. in Opp'n at 2 ("Defendant created a hostile work environment, and Defendant retaliated against Plaintiff for filing a CHRO complaint and an internal complaint about the hostile work environment."). He argues that he was subjected to repeated hostile treatment connected to his race and national origin. *Id.* at 3 ("When Plaintiff would respond to radio transmissions, the party on the other side would frequently state '22,' which is code for 'repeat.'"); *id.* ("Although an occasional request to repeat would be understandable, the volume of these requests was unreasonable and meant to demean Mr. Laghari based on his accent."); *id.* ("Other COs, even those with accents, did not experience anywhere close to the number of '22' requests.").

Mr. Laghari also relies on allegations that "Plaintiff would often receive calls wherein the other party would hang up as soon as Plaintiff answered," *id.*, and that he saw graffiti stating "Go back to Corrigan. Corrigan does not want him" and "POS list" followed by "SMOL" or "suck me off Laghari," *id.* at 4. He further argues that, "[w]hen viewed in the context of the totality of the circumstances and deciding all inferences in favor of Plaintiff, the graffiti and 'chicken balls'

13

note demonstrate the severity of the racially and ethnically based harassment experienced by Mr. Laghari." *Id.* at 10

The DOC argues that Mr. Laghari has not plausibly alleged a hostile work environment because "Plaintiff does not specifically assert a hostile work environment claim in his Complaint" and, "[i]n fact, he does not even mention the term 'hostile,' but mentions the word 'harassment' four times in his Complaint." Def.'s Mem. at 19.

The DOC further argues that, "[t]o the extent Plaintiff does attempt to state a hostile work environment claim, it is legally insufficient because Plaintiff fails to plausibly allege that the work environment was sufficiently severe and pervasive to alter the conditions of his employment, and that any of the acts alleged in the Complaint were based on any of his protected categories." *Id.*

The DOC also argues that Mr. Laghari "fails to identify the perpetrators or allege how frequently this happened or provide any further details whatsoever to establish that these incidents were 'severe and pervasive' to constitute a hostile work environment." *Id.* at 21. In the DOC's view, the alleged incidents involving supervisors "only suggest isolated incidents of conduct that does not even appear offensive and at best describe interactions and feedback between Plaintiff and his superiors on work-related matters," and the bathroom graffiti allegations "do not even establish that these statements were directed to the Plaintiff or that the note left at his desk about chicken was connected to his protected categories or was offensive in any way." *Id.* at 21–22.

The Court agrees in part, and disagrees in part.

At this stage, the Court must consider the alleged incidents collectively, rather than isolate each event and ask whether that event alone would establish a hostile work environment.

14

Under *Harris*, whether an environment is hostile or abusive "can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct," "its severity," whether it is "physically threatening or humiliating," and whether it "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

When viewed together, Mr. Laghari's allegations plausibly suggest that the alleged conduct was not merely episodic workplace friction, but part of a broader pattern of discriminatory hostility. Mr. Laghari alleges that, after his transfer to YCI, he "continued to experience acts of discrimination, harassment and retaliation," *id*. ¶ 10; that radio requests to repeat were made "frequently," *id*. ¶ 11; that harassing phone calls were "frequent," id. ¶ 13; that he was "continuously" assigned undesirable posts with "lifers," *id*. ¶ 17; and that the bathroom graffiti "was not removed for several weeks," *id*. ¶ 20.

The DOC may ultimately be correct that the alleged incidents were isolated, non-discriminatory, or insufficiently severe or pervasive to support liability. But that conclusion would require a more developed factual record. At this stage, Mr. Laghari need not prove that the alleged conduct actually altered the conditions of his employment, he must allege facts making that inference plausible. *Vega*, 801 F.3d at 87 ("On a motion to dismiss, the question is not whether a plaintiff is likely to prevail, but whether the well-pleaded factual allegations plausibly give rise to an inference of unlawful discrimination.").

Here, the Complaint alleges repeated radio and phone harassment tied to Mr. Laghari's accent, derogatory graffiti that could plausibly be read as directed at him, and a delayed or ineffective response after he complained. Compl. ¶ 11 ("This request to repeat was done to demean the plaintiff due to his accent."); *id*. ¶ 20 ("Go back to Corrigan. Corrigan does not want him."); *id*. ¶ 22 ("The plaintiff sent an email to Warden Sexton (Caucasian female) about what

happened, and she replied there would be a meeting called to discuss this, but the meeting never happened."); *id.* ¶ 23 ("the plaintiff wrote a letter to DOC commissioner Angel Quiros about the systemic racism at the facility, and he received no meaningful response."); *see also* Pl.'s Mem. in Opp'n at 10 ("Frequent radio and telephone harassment; offensive graffiti directed at Mr. Laghari; false accusations of improper job performance; and arbitrary discipline all demonstrate that the harassment experienced by Plaintiff was both severe and pervasive thus fulfilling the first requirements for establishing a hostile work environment claim.").

The same is not true, however, for any hostile work environment theory based on sex or religion. As to those protected characteristics, Mr. Laghari has not identified comparable factual allegations showing that he was subjected to severe or pervasive hostility because of his sex or religion. The Complaint alleges that "[t]he plaintiff is a Pakistani male and a practicing Muslim," Compl. ¶ 3, and later alleges in conclusory terms that "Defendant discriminated against Plaintiff because of his sex," *id.* ¶ 26, and that "Defendant discriminated against Plaintiff and terminated Plaintiff's employment because of Plaintiff's religious creed," *id.* Count Five ¶ 26.

But the factual allegations supporting the hostile work environment theory concern accent, national origin, race, and ethnicity; they do not include comparable allegations of sex-based or religion-based harassment. Mr. Laghari's opposition likewise frames the hostile work environment theory around race, ethnicity, national origin, accent, and the graffiti, not specific sex- or religion-based hostile conduct. *See also* Pl.'s Mem. in Opp'n at 9 ("The graffiti directly references Corrigan making Mr. Laghari's interpretation that is was directed at him not just plausible, but reasonable."); *id.* at 10 ("the graffiti and 'chicken balls' note demonstrate the severity of the racially and ethnically based harassment experienced by Mr. Laghari.").

Accordingly, the DOC's motion to dismiss Mr. Laghari's Title IV hostile work environment claim will be denied to the extent the claim is based on race or national origin, and granted without prejudice to the extent the claim is based on sex or religion.

### ii. The Hostile Work Environment Claim under CFEPA

Mr. Laghari's Title VII hostile work environment claim survives in part; the Court thus next considers his parallel hostile work environment claim under CFEPA. "The standard governing discrimination under the CFEPA is the same as that governing Title VII." *Gray v. Minn. Mining & Mfg. Co.*, 732 F. Supp. 3d 184, 189 (D. Conn. 2024) (citing *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.")); *see also id.* (stating that "Connecticut courts look to federal case law for guidance in interpreting that provision of the CFEPA"). "As with CFEPA discrimination claims, Connecticut courts look to federal law for guidance when analyzing CFEPA hostile work environment claims." *Id.* at 191.

To establish a CFEPA hostile work environment claim, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* ("the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"). Courts must examine "all the circumstances," including "the frequency of the discriminatory conduct," "its severity," whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it "unreasonably interferes with an employee's work performance." *Id.*

The DOC argues that Mr. Laghari's CFEPA hostile work environment claim should be dismissed in full.

The Court agrees in part and disagrees in part.

For the same reasons that Mr. Laghari has plausibly alleged a Title VII hostile work environment claim based on race and national origin, he also has plausibly alleged a CFEPA hostile work environment claim based on race, color, and national origin. The Complaint alleges repeated radio and phone harassment tied to Mr. Laghari's accent. Compl. ¶ 11 ("This request to repeat was done to demean the plaintiff due to his accent."); *id.* ¶ 13 ("The plaintiff has also experienced frequent harassing phone calls wherein the other party hangs up as soon as he answers."). The Complaint also alleges graffiti and a note that, at this stage, could plausibly be understood as directed at him. *Id.* ¶ 20 ("Go back to Corrigan. Corrigan does not want him."); *id.* ("The plaintiff also had a note reading 'chicken balls' left in his desk drawer."). And the Complaint alleges a delayed or ineffective response after Mr. Laghari complained. *Id.* ¶ 22 ("The plaintiff sent an email to Warden Sexton (Caucasian female) about what happened, and she replied there would be a meeting called to discuss this, but the meeting never happened."); *id.* ¶ 23 ("the plaintiff wrote a letter to DOC commissioner Angel Quiros about the systemic racism at the facility, and he received no meaningful response.").

At this stage, those allegations are enough to allow the CFEPA hostile work environment claim to proceed on the basis of race, color, and national origin. They plausibly allege more than isolated workplace friction and instead suggest a pattern of workplace hostility tied to Mr. Laghari's accent, race, and national origin.

But as discussed above, the Complaint does not allege comparable facts connecting the alleged hostile conduct to Mr. Laghari's sex or religious creed. The Complaint alleges that Mr.

Laghari is "a Pakistani male and a practicing Muslim," Compl. ¶ 3, and later alleges in conclusory terms that the DOC discriminated against him because of sex and religious creed, *id.* ¶ 26; *id.* Count Five ¶ 26. The factual allegations supporting the hostile work environment theory concern accent, race, color, national origin, and ethnicity. They do not include comparable allegations of sex-based or religious- creed-based harassment. Mr. Laghari's opposition likewise frames the hostile work environment theory around race, ethnicity, national origin, accent, and the graffiti. *See also* Pl.'s Mem. in Opp'n at 10 ("the graffiti and 'chicken balls' note demonstrate the severity of the racially and ethnically based harassment experienced by Mr. Laghari.").

Accordingly, the DOC's motion to dismiss Mr. Laghari's CFEPA hostile work environment claim will be denied to the extent the claim is based on race, color, or national origin, and will be granted without prejudice to the extent the claim is based on sex or religious creed.

### C. The Retaliation Claims

#### i. The Retaliation Claim under Title VII

Title VII's anti-retaliation provision makes it an "unlawful employment practice" for an employer to discriminate against an employee or applicant "because he has opposed any practice made an unlawful employment practice by this subchapter," or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

To state a Title VII retaliation claim, a plaintiff must plausibly allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

For retaliation claims, the adverse-action standard is broader than the standard governing substantive discrimination claims. A plaintiff need not allege an action that affected the terms and conditions of employment. Instead, the alleged retaliatory action must be "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 165 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Still, "petty slights or minor annoyances that often take place at work and that all employees experience" are not actionable. *Id.* (quoting *White*, 548 U.S. at 68). As to causation, a plaintiff may plead a causal connection directly, through allegations of retaliatory animus, or indirectly, by alleging that the protected activity was closely followed by adverse treatment. See *id.* at 170 ("[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."). And for purposes of employer knowledge at the prima facie stage, a plaintiff may rely on "general corporate knowledge" that the plaintiff engaged in protected activity. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.")(citation omitted).

The DOC argues that Mr. Laghari has not plausibly alleged retaliation because "Plaintiff has failed to plead that he engaged in a protected activity, that the DOC knew of his engagement in such protected activity, and that any adverse employment actions resulted from his engagement in such protected activity." Def.'s Mem. at 24. The DOC further argues that Count Nine merely alleges that "Defendant retaliated against Plaintiff because of his sex, race/color, religious creed, and national origin," and that "[c]laiming that Defendant retaliated against

Plaintiff based on his protected categories in effect is a claim of discrimination, not retaliation." *Id.* at 25.

As to the promotion denial, the DOC argues that Mr. Laghari "does not allege for what protected activity he was retaliated against," and that, even if the 2020 CHRO complaint is the protected activity, "Plaintiff does not allege who was the person who denied him a promotion, at which facility this person was, and that this person was aware of the 2020 CHRO complaint." *Id.* at 25–26. The DOC also argues that Mr. Laghari cannot establish causation because "there is no temporal proximity between the 2020 CHRO complaint and denial of promotion in April 2024." *Id.* at 26.

Mr. Laghari responds that he has adequately alleged retaliation based on the denial of his promotion to lieutenant shortly after the resolution of his CHRO complaint. Pl.'s Mem. in Opp'n at 14 ("Filing a CHRO complaint is a protected activity, and Defendant was aware that Plaintiff filed the 2020 CHRO complaint."). He argues that "there can be no dispute that by filing the CHRO complaint, Mr. Laghari engaged in a protected activity." *Id.* He further argues that the DOC knew of the protected activity because "a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." *Id.* at 15 (quoting *Zann Kwan*, 737 F.3d at 844). As to adverse action, Mr. Laghari argues that "a defendant's failure to promote falls under the definition of an adverse employment action." *Id.* He also argues that temporal proximity supports causation because "Plaintiff's CHRO complaint settled in March of 2024, and he was denied the promotion to lieutenant in April of 2024." *Id.* at 16.

The Court agrees in part, and disagrees in part.

As to the alleged denial of Mr. Laghari's promotion to lieutenant, the Complaint plausibly alleges a Title VII retaliation claim at this early stage. Mr. Laghari alleges that he filed a CHRO complaint in 2020 after experiencing "significant, severe and distressing employment discrimination" based on "race, color, national origin, and religion." Compl. ¶ 6. He further alleges that the CHRO matter "was eventually resolved by agreement in and around March 2024," *id.* ¶ 7, that, "[a]s a result of this agreement," he transferred to YCI "in and around April 2024," *id.* ¶ 8, and that, "[j]ust a few days after his transfer to YCI," he "received a letter from the defendant denying his application for promotion to lieutenant," *id.* ¶ 9. He also alleges that "this promotion denial was retaliatory due to previously filing a claim for discrimination." *Id.*

These allegations plausibly plead protected activity, the filing of a CHRO complaint, the DOC's knowledge of that activity, a materially adverse action, and causation. *See Zann Kwan*, 737 F.3d at 844 (stating the *McDonnel Douglas* factors for a retaliation claim). And because Mr. Laghari alleges that the CHRO matter resolved by agreement with Defendant in March 2024, the Complaint plausibly supports an inference, at this stage, that Defendant had at least general corporate knowledge of the protected activity. *See id.* ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.")(citation omitted).

The Complaint also alleges a materially adverse action because Mr. Laghari alleges that the DOC denied his "application for promotion to lieutenant." Compl. ¶ 9. A denied promotion qualifies as an adverse employment action for purposes of a retaliation claim. *See Guy v. MTA New York City Transit*, 407 F. Supp. 3d 183, 195 (E.D.N.Y. 2016) ("A failure to promote is an adverse employment action."). And although the DOC argues that the relevant gap is between the

2020 CHRO complaint and the April 2024 promotion denial, Mr. Laghari plausibly alleges that the promotion denial occurred shortly after the March 2024 resolution of the CHRO matter and his April 2024 transfer to YCI, both of which allegedly flowed from the protected proceeding. Compl. ¶¶ 7–9. Drawing all reasonable inferences in Mr. Laghari's favor, these allegations are sufficient at the pleading stage to support a causal connection.[4]

The DOC may ultimately show that the relevant decisionmaker did not know of Mr. Laghari's CHRO complaint, that the promotion denial was unrelated to the CHRO matter, or that the temporal connection is too attenuated to establish but-for causation. But those arguments require factual development. At this stage, Mr. Laghari's allegations that the CHRO matter resolved in March 2024, that he transferred to YCI in April 2024 as part of that resolution, and that he was denied a promotion "[j]ust a few days after his transfer to YCI" are sufficient to state a plausible Title VII retaliation claim.

The Complaint does not, however, plausibly allege a separate Title VII retaliation claim based on Mr. Laghari's later internal complaints. Mr. Laghari alleges that, "[i]n and around May of 2024," he "filed a complaint with Captain Paselio based on this harassment," and that Captain Paselio later told him the complaint "was lost and he needed to rewrite it." Compl. ¶ 14. He also alleges that, after the bathroom graffiti incident, Lieutenant Osorio "tried to persuade him not to

---

[4] Significantly, despite the Court's dismissal of Mr. Laghari's discriminatory failure-to-promote theory, a promotion denial may fail as a discrimination claim where the complaint does not plausibly allege that the denial was motivated by a protected characteristic, but still qualify as an adverse action for purposes of a retaliation claim. See *Guy*, 407 F. Supp. 3d at 194–95 (dismissing discrimination claim based on denial of promotion where the plaintiff "fail[ed] to plead any facts that would show directly that the denial of a promotion was related in any way to his race or religion," but denying dismissal of retaliation claim where the plaintiff alleged protected activity, employer knowledge, that he "was not promoted although he was properly qualified," and that "[a] failure to promote is an adverse employment action"). Here, although the Complaint does not plausibly allege that the promotion denial was motivated by Mr. Laghari's sex, religion, race/color, or national origin, it does plausibly allege that the promotion denial followed the resolution of his CHRO complaint and transfer to YCI closely enough to support a retaliation theory at the pleading stage.

file" an incident report, *id.* ¶ 21, that Warden Sexton said a meeting would be called but "the meeting never happened," *id.* ¶ 22, and that Commissioner Quiros provided "no meaningful response," *id.* ¶ 23. These allegations may be relevant to Mr. Laghari's hostile work environment claim, but they do not identify a materially adverse action taken because of those later complaints.

Nor do the other alleged incidents cure that defect. Mr. Laghari alleges that he was "continuously" assigned undesirable posts "since reporting to work at YCI," Compl. ¶ 17, but that allegation does not plausibly connect the assignments to the later May 2024 complaint or to the later complaints about bathroom graffiti. Likewise, the allegations that his July 2024 disciplinary report was "treated dismissively," *id.* ¶ 24, and that Lieutenant Tasarz questioned his judgment, *id.* ¶ 25, do not include facts tying those incidents to protected activity. Without factual allegations connecting these later events to a protected complaint, the Complaint does not plausibly allege retaliation based on Mr. Laghari's internal complaints.

Accordingly, the DOC's motion to dismiss Mr. Laghari's Title VII retaliation claim will be denied to the extent the claim is based on the alleged denial of his application for promotion to lieutenant following the resolution of his CHRO complaint, and will be granted to the extent the claim is based on his internal complaints or any other alleged retaliatory conduct.

### ii. The Retaliation Claim under CFEPA

Mr. Laghari also brings a retaliation claim under CFEPA. CFEPA makes it a discriminatory practice "[f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice." Conn. Gen. Stat. § 46a-60(b)(4); *see also Osei-Assibey v. Stop & Shop Supermarket Co.* LLC, 2023 WL 2743280, at *7 n.2 (D. Conn. Mar. 31,

2023). CFEPA also prohibits discrimination against a person because that person "has filed a complaint or testified or assisted in [various proceedings]." *Mallison v. Conn. Off. of Early Childhood*, 634 F. Supp. 3d 21, 37 (D. Conn. 2022).

The analysis of retaliation claims under CFEPA is "the same as under Title VII." *Mallison*, 634 F. Supp. 3d at 38. Thus, to state a CFEPA retaliation claim, a plaintiff must plausibly allege "(1) that [he] participated in an activity protected by Title VII, (2) that [his] participation was known to [his] employer, (3) that [his] employer thereafter subjected [him] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.*

The Court has concluded that Mr. Laghari has plausibly alleged a Title VII retaliation claim based on the denial of his application for promotion to lieutenant following the resolution of his CHRO complaint, the corresponding CFEPA retaliation theory may proceed for the same reasons. The DOC's arguments for dismissal of the CFEPA retaliation claim substantially overlap with its arguments for dismissal of the Title VII retaliation claim. The DOC argues that Mr. Laghari has not plausibly alleged retaliation because "Plaintiff has failed to plead that he engaged in a protected activity, that Defendant knew of his engagement in such protected activity, and that any adverse employment actions resulted from his engagement in such protected activity." Def.'s Mem. at 24.

For the reasons discussed above, however, the Complaint plausibly alleges that Mr. Laghari engaged in protected activity by filing the CHRO complaint, that the DOC knew of that activity because the CHRO matter allegedly resolved by agreement, that the DOC denied his application for promotion to lieutenant shortly after the CHRO matter resolved and he

transferred to YCI, and that the timing supports a plausible inference of causation at the pleading stage.

Accordingly, the DOC's motion to dismiss Mr. Laghari's CFEPA retaliation claim will be denied to the extent the claim is based on the alleged denial of his application for promotion to lieutenant following the resolution of his CHRO complaint, and granted to the extent the claim is based on his internal complaints or any other alleged retaliatory conduct.

### D. The Wrongful Termination or Constructive Discharge Claims

#### i. The Wrongful Termination or Constructive Discharge Claim under Title VII

A discriminatory discharge claim may be based on either an actual discharge or a constructive discharge. See *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87–89 (2d Cir. 1996) ("One of the elements of a prima facie case of discriminatory discharge, as one might expect, is that the employee was discharged."; "This element may be satisfied by a showing of an actual or a constructive discharge."). An actual discharge occurs when the employer uses language or engages in conduct that "would logically lead a prudent person to believe his tenure has been terminated." *Id.* at 88. A constructive discharge occurs when "an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Id.* at 89. Working conditions are intolerable when they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.*

The constructive-discharge standard is objective and demanding. *See Green v. Town of East Haven*, 952 F.3d 394, 404–05 (2d Cir. 2020) ("[T]he principle we have consistently applied is that a plaintiff makes a prima facie showing of an adverse employment action if she adduces evidence from which a rational juror could infer that the employer made her working condition,

26

viewed as a whole, 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"). Although constructive discharge may be shown where "the employer gave the plaintiff the choice of resigning or being fired," *id.* at 404, it cannot be shown simply because the employee was unhappy with assignments, disagreed with criticism, or found working conditions difficult or unpleasant, *id.* at 404–05.

The DOC argues that "[a]side from the word 'terminated' mentioned in passing in ¶ 26 of those counts, the Complaint is entirely devoid of any allegations that Plaintiff was terminated." Def.'s Mem. at 22. The DOC further argues that, "[t]o the extent Plaintiff attempts to assert a termination claim, Defendant will address it as a constructive discharge, as Plaintiff did resign from Defendant," but that any such theory "would have to fail, similar to all other claims, as legally insufficient." *Id.* The DOC also argues that Mr. Laghari "does not allege any facts suggesting that Defendant intentionally created an intolerable work atmosphere that forced him to quit involuntarily," and that he "does not even allege quitting." *Id.* at 23. In reply, the DOC notes that Mr. Laghari "does not address the arguments relating to the claims of disparate treatment, wrongful termination or constructive discharge," and argues that "these claims are abandoned and must be dismissed." Def.'s Reply at 1.

Mr. Laghari does not specifically respond to the DOC's wrongful-termination or constructive-discharge argument. His opposition instead argues more generally that the DOC's motion "seeks to dismiss Plaintiff's claims of sex discrimination, race and color discrimination, religious discrimination, national origin discrimination, and retaliation," Pl.'s Mem. in Opp'n, at 1, and that "Defendant's Motion to Dismiss should be denied in its entirety," *id.* at 2.

The Court disagrees.

27

To the extent Mr. Laghari attempts to assert a Title VII wrongful-termination or constructive-discharge theory, that theory has not been plausibly alleged. The Complaint repeatedly alleges, in conclusory terms, that the DOC "terminated Plaintiff's employment" because of a protected characteristic. Compl. ¶ 26 ("Defendant retaliated and discriminated against Plaintiff and terminated Plaintiff's employment because of his sex in violation of Title VII of the Civil Rights Act of 1964 . . . ."). But the Complaint does not allege when Mr. Laghari was terminated, who terminated him, the circumstances of any termination, or facts showing that the DOC used language or conduct that would reasonably lead him to believe his employment had been terminated.

Nor does the Complaint plausibly allege constructive discharge. Constructive discharge requires, at a minimum, facts showing that the employee quit involuntarily because the employer intentionally created intolerable working conditions. *See Chertkova*, 92 F.3d at 89 ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."). The Complaint does not allege that Mr. Laghari resigned, retired, quit, or otherwise left his employment because of the alleged conditions at YCI. Nor does it allege that the DOC gave him the choice of resigning or being fired. *See Green*, 952 F.3d at 404 ("[S]uch an intolerable condition may be shown by evidence that the employer gave the plaintiff the choice of resigning or being fired.").

Accordingly, the DOC's motion to dismiss Mr. Laghari's Title VII wrongful-termination or constructive-discharge theory will be granted.

### ii. The Wrongful Termination or Constructive Discharge Claim under CFEPA

Because the Title VII wrongful-termination and constructive-discharge theory does not survive, the Court does not separately address any corresponding CFEPA theory.

### E. The Jury Demand as to the CFEPA Claims

Article first, § 19, of the Connecticut Constitution provides that "[t]he right of trial by jury shall remain inviolate." *Skinner v. Angliker*, 211 Conn. 370, 373 (1989). And the Complaint requests "[a] trial by jury," Compl. at 17.

In determining whether a party has a right to a jury trial under the Connecticut Constitution, "the court must ascertain whether the action being tried is similar in nature to an action that could have been tried to a jury in 1818 when the state constitution was adopted." *Skinner.,* 211 Conn. at 376. That inquiry asks whether the cause of action has "roots in the common law" and whether "the remedy involved was one in law or equity." *Id.*

This inquiry differs, however, when the defendant is the State. In an action against the State, "it is not enough that the nature of the plaintiff's action is 'legal' rather than equitable; the action must also be brought against a defendant who was suable at common law in [1818]." *Id.* at 378. As a result, when the State waives sovereign immunity by statute, "the right to a jury trial cannot be implied, but rather, must be affirmatively expressed." *Id.* at 381; *see also Canning v. Lensink*, 221 Conn. 346, 354 (1992) ("When the state, by statute, waives its immunity to suit . . . the right to a jury trial cannot be implied, but rather, must be affirmatively expressed.").

"In the absence of such a specification," Connecticut courts have concluded "that the legislature intended that the action should be tried without a jury." *Canning*, 221 Conn. at 354. The Connecticut Appellate Court has applied the same rule, explaining that a plaintiff has a constitutional jury-trial right against the State only if the claim is comparable to one triable to a jury in 1818 and is "brought against a defendant who was suable at common law in 1818." *Perez v. Univ. of Conn.*, 182 Conn. App. 278, 284–85 (2018).

29

As to CFEPA specifically, Connecticut's Superior Courts have held that Conn. Gen. Stat. § 46a-100 does not provide a jury-trial right against the State. In *Trantolo v. State Department of Transportation*, the court held that "no right to a jury trial exists pursuant to General Statutes § 46a-100" because § 46a-100 "contains no provision regarding trial by jury." No. CV 970569475S, 1999 WL 439356, at *3 (Conn. Super. Ct. June 8, 1999). Likewise, in *Roman v. Department of Corrections*, the court held that "neither [§ 46a-100 nor § 46a-60] explicitly provides for a jury trial" and that "there is no right to a jury trial in an action alleging a violation of § 46a-60 against the state and/or its officers acting in their official capacity brought in Superior Court pursuant to § 46a-100." No. CV 055000278S, 2006 WL 2556376, at *12 (Conn. Super. Ct. Aug. 11, 2006).

The DOC argues that Mr. Laghari's jury demand must be dismissed as to the CFEPA claims because those claims are brought against the State, and neither Conn. Gen. Stat. § 46a-60 nor Conn. Gen. Stat. § 46a-100 affirmatively provides a right to a jury trial against the State. Def.'s Mem. at 27 ("Plaintiff's request for a jury trial with respect to CFEPA claims must be dismissed"). The DOC further argues that, because "the right to a jury trial cannot be implied, but rather, must be affirmatively expressed," *id.* at 27 (quoting *Skinner*, 211 Conn. at 381), and because "no right to a jury trial exists pursuant to General Statutes 46a-100," *id.* at 28 (quoting *Trantolo*, 1999 Conn. Super. LEXIS 1554, at *7–8), Mr. Laghari's jury demand cannot proceed as to the CFEPA claims.

Mr. Laghari does not specifically respond to the DOC's argument that there is no jury-trial right as to the CFEPA claims. The Complaint requests "[a] trial by jury," Compl. at 17, and Mr. Laghari's opposition generally asks the Court to "deny the Defendant's [m]otion to [d]ismiss

30

in its entirety," Pl.'s Mem. in Opp'n at 1, but he does not identify any statutory language expressly providing a right to a jury trial against the State on his CFEPA claims.

The Court thus agrees with the Defendant.

Although Conn. Gen. Stat. § 46a-100 waives the State's sovereign immunity for certain employment-discrimination actions in Superior Court, that waiver does not, by itself, create a right to a jury trial. *See Trantolo*, 1999 WL 439356, at *1 ("General Statutes § 46a-100, which waives the state's sovereign immunity in employment discrimination cases, does not confer a right to a jury trial."). Under *Skinner*, *Canning*, and *Perez*, any jury-trial right against the State must be affirmatively expressed. *See Skinner*, 211 Conn. at 381 ("When the state, by statute, waives its immunity to suit . . . the right to a jury trial cannot be implied, but rather, must be affirmatively expressed."); *Canning*, 221 Conn. at 354 ("In the absence of such a specification, we have concluded that the legislature intended that the action should be tried without a jury."); *Perez*, 182 Conn. App. at 288–89 ("When the state, by statute, waives its immunity to suit . . . the right to a jury trial cannot be implied, but rather, must be affirmatively expressed.").

Neither § 46a-60 nor § 46a-100 expressly provides a right to a jury trial against the State. *See Roman*, 2006 WL 2556376, at *12 ("[N]either statute explicitly provides for a jury trial."). And Connecticut Superior Court authority has applied that rule specifically to CFEPA claims, concluding that no jury-trial right exists under § 46a-100 for CFEPA claims against the State. See *Trantolo*, 1999 WL 439356, at *3 ("The court concludes that no right to a jury trial exists pursuant to General Statutes § 46a-100."); *Roman*, 2006 WL 2556376, at *12 ("[T]here is no right to a jury trial in an action alleging a violation of § 46a-60 against the state and/or its officers acting in their official capacity brought in Superior Court pursuant to § 46a-100.").

Accordingly, the DOC's motion to dismiss Mr. Laghari's jury demand will be granted to the extent Mr. Laghari seeks a jury trial on his CFEPA claims.[5]

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion to dismiss, ECF No. 19, is **GRANTED** in part and **DENIED** in part.

The DOC's motion is **GRANTED** to the extent Mr. Laghari asserts disparate treatment claims based on sex, race/color, religion, or national origin; hostile work environment claims based on sex or religion; retaliation claims based on his internal complaints or any other alleged retaliatory conduct; and any wrongful termination or constructive discharge claim, as well as to the extent Mr. Laghari seeks a jury trial on his CFEPA claims.

To the extent that any of these deficiencies can be remedied, leave to file an Amended Complaint must be filed by **July 2, 2026**. If a motion for leave to file an Amended Complaint is not filed by **July 2, 2026**, the case will proceed only as to the claims referenced below.

The DOC's motion is **DENIED** to the extent Mr. Laghari asserts hostile work environment claims based on race, color, or national origin, and retaliation claims under Title VII and CFEPA based on the alleged denial of his application for promotion to lieutenant following the resolution of his CHRO complaint.

**SO ORDERED** at New Haven, Connecticut, this 5th day of June, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[5] This Ruling and Order does not address and should not be construed as addressing any right to a jury trial Mr. Laghari may have on any other surviving federal or state law claims.